BK1005435
TJK

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
AT COVINGTON

IN RE:

Rhett W Frambes
Rachel A. Frambes

Debtors

Case No. 09-20312

Chapter 7

Judge Wise

**MOTION OF JPMORGAN CHASE
BANK, NATIONAL ASSOCIATION FOR
RELIEF FROM THE AUTOMATIC
STAY AND FOR ABANDONMENT
(PROPERTY LOCATED AT 353
RIVERBEND DRIVE, COVINGTON, KY
41016)**

JPMorgan Chase Bank, National Association (the "Movant") moves this Court, under §§ 361,

362, 363, 554 and other sections of the Bankruptcy Reform Act of 1978, as amended (the "Bankruptcy

Code") and under Rules 4001, 6007 and other rules of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules") for an Order conditioning, modifying or dissolving the automatic stay imposed by §

362 of the Bankruptcy Code and for abandonment of property under § 554 of the Bankruptcy Code. In

support of this Motion, the Movant states:

## MEMORANDUM IN SUPPORT

1    The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334. This is a core

proceeding under 28 U.S.C. § 157(b)(2). The venue of this case and this Motion is proper under 28

U.S.C. §§ 1408 and 1409.

2    On January 17, 2007, the debtor Rhett W Frambes obtained a loan from Washington Mutual

Bank, FA in the amount of $276,000.00. Such loan was evidenced by a promissory note dated January 17, 2007, (the "Note").

3    To secure payment of the Note and performance of the other terms contained in it, the debtor Rhett W Frambes executed a Mortgage dated January 17, 2007 (the "Security Agreement"). The Security Agreement granted a lien on the real and/or personal property (the "Collateral") owned by the debtors, located at 353 Riverbend Drive, Covington, KY 41016 and more fully described in the Security Agreement.

4    The lien created by the Security Agreement was duly perfected by the filing of the Security Agreement in the Office of the Kenton County Clerk on January 23, 2007. The lien is the First lien on the Collateral.

5    The Note and Security Agreement were transferred as follows:

JPMorgan Chase Bank, National Association, is purchaser of the loans and other assets of Washington Mutual Bank, formerly known as Washington Mutual Bank, FA (the "Savings Bank") from the Federal Deposit Insurance Corporation, acting as receiver for the Savings Bank and pursuant to its authority under the Federal Deposit Insurance Act, 12 U.S.C. § 1821(d) as evidenced by the October 2, 2008 Affidavit of the Federal Deposit Insurance Corporation.

6    The value of the Collateral is $272,000.00. This valuation is based on the Debtor's Schedules.

7    Debtors claimed an exemption in the property of $0.

8    As of the date of this Motion, there is currently due and owing on the Note the outstanding balance of $291,041.13, plus interest accruing thereon at the rate of 3.507% per annum ($27.43 per day) from September 21, 2010.

2

9    Other parties who may have an interest in the Collateral are:

Washington Mutual by virtue of a second mortgage upon which the amount due is approximately

$34,000.00.

City of Ludlow by virtue of a property taxes upon which the amount due is approximately

$1,007.00.

Kenton Co. Sheriff by virtue of property taxes upon which the amount due is approximately

$3,043.00.

10 The Movant is entitled to relief from the automatic stay under §§ 362(d)(1) and/or 362(d)(2) for

these reasons:

This case is a Chapter 7 wherein debtor is in default for payment on the mortgage loan

and there is no equity for the benefit of the estate.

11 Movant has attached as  "A", a copy of the proof of claim filed in this case by Movant, along with

copies of the supporting documents establishing the Movant's perfected security interest in the above

described collateral.

WHEREFORE, Movant prays that the automatic stay imposed by 11 U.S.C. § 362 be terminated

in all respects as against said Movant, and its successors and assigns; and that the Trustee's interest be

abandoned pursuant to 11 U.S.C. § 554, Bankruptcy Rule 6007(b) and E.D.Ky. LBR 4001-1.


/s/ Rachel K. Pearson
Rachel K. Pearson
KY Bar Registration #91184
(513) 241-3100 x-3309


LERNER, SAMPSON & ROTHFUSS
Attorneys for Movant
PO Box 5480
Cincinnati, OH 45201-5480
(513) 354-6464 fax
ekybk@lsrlaw.com

## NOTICE AND OPPORTUNITY FOR HEARING

The undersigned certifies that a copy of the foregoing Motion for Relief from the Automatic Stay and for Abandonment of Property of the secured creditor, JPMorgan Chase Bank, National Association, was electronically transmitted on September 20, 2010 via the Court's CM/ECF system to the following who are listed on the Court's Electronic Mail Notice list.  Unless within fifteen (15) days from the date hereof a written responsive objection to the Motion is filed with the Court and served on the undersigned, an order sustaining the Motion may be entered by the Court.

A hearing will be held only in the event a written responsive objection is timely filed and served.

Hon. Steven L. Schiller
4 West Fourth Street #200
Newport, KY 41071
schiller@fuse.net

Michael L. Baker, Trustee
541 Buttermilk Pike #500
P.O. Box 175710
Covington, KY 41017-5710
trusteemlb@zslaw.com

Office of the U.S. Trustee
100 East Vine Street, Ste. 500
Lexington, KY 40507
ustpregion08.lx.ecf@usdoj.gov

1

The undersigned certifies that a copy of the foregoing Motion for Relief from the Automatic Stay and for Abandonment of Property of the secured creditor, JPMorgan Chase Bank, National Association, was transmitted on September 20, 2010 via regular U.S. mail, postage pre-paid:

Rhett W Frambes
353 Riverbend Dr.
Ludlow, KY 41016

Rachel A. Frambes
353 Riverbend Dr.
Ludlow, KY 41016

Washington Mutual
FSC0127
PO Box 100512
Florence, SC 29502

City of Ludlow
PO Box 16188
Ludlow, KY 41016

Kenton Co. Sheriff
PO Box 188070
Erlanger, KY 41018-8070

/s/ Rachel K. Pearson
Rachel K. Pearson
KY Bar Registration #91184
(513) 241-3100 x-3309

LERNER, SAMPSON & ROTHFUSS
PO Box 5480
Cincinnati, OH 45201-5480
(513) 354-6464 fax
ekybk@lsrlaw.com

2

| UNITED STATES BANKRUPTCY COURT   EASTERN DISTRICT OF KENTUCKY COVINGTON DIVISION | PROOF OF CLAIM |
|---|---|

Form B10 (Official Form 10) (12/08)

| Name of Debtor: Rhett W Frambes | Case Number: 09-20312-WSH |
|---|---|

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

| Name of Creditor (the person or other entity to whom the debtor owes money or property):<br>JPMorgan Chase | ⬜ Check this box to indicate that this claim amends a previously filed claim. |
|---|---|
| Name and address where notices should be sent:<br>JPMorgan Chase Bank, National Association<br>7255 Baymeadows Way Mail Stop JAXB2007<br>Jacksonville, Florida 32256 | Court Claim Number: _____<br>(*If known*)<br><br>Filed on: |
| Name and address where payment should be sent (if different from above):<br>JPMorgan Chase Bank, National Association<br>7255 Baymeadows Way Mail Stop JAXB2007<br>Jacksonville, Florida 32256<br><br>Telephone Number: (800) 766-7751 | ⬜ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br>⬜ Check this box if you are the debtor or trustee in this case. |

| | |
|---|---|
| **1. Amount of Claim as of Date Case Filed:**   $295,820.42<br><br>If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.<br><br>If all or part of your claim is entitled to priority, complete item 5.<br><br>☒ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges. | **5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.<br><br>Specify the priority of the claim. |
| **2. Basis for Claim:** Money Loaned<br>(See instruction #2 on reverse side.) | ⬜ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B). |
| **3. Last four digits of any number by which creditor identifies debtor:** xxxxxx8157<br><br>**3a. Debtor may have scheduled account as:** _____<br>(See instruction #3a on reverse side.) | ⬜ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507 (a)(4). |
| **4. Secured Claim** (See instruction #4 on reverse side.)<br>Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.<br><br>**Nature of property or right of setoff:** ☒ Real Estate ⬜ Motor Vehicle ⬜ Other: _____<br>Describe:<br><br>**Value of Property:** not available       **Annual Interest Rate:**<br><br>Amount of arrearage and other charges as of time case filed included in secured claim,<br><br>if any: $7,693.28 **Basis for perfection:** Recordation of Lien<br><br>**Amount of Secured Claim:** $295,820.42 **Amount Unsecured** $0.00 | ⬜ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).<br><br>⬜ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).<br><br>⬜ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8). |
| **6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.<br>**7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. (*See instruction 7 and definition of "redacted" on reverse side.*)<br><br>DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.<br>If the documents are not available, please explain: | ⬜ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).<br><br>**Amount entitled to priority:**<br>$ _____<br><br>*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.* |

| Date:<br>March 17, 2009 | **Signature:** The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.<br><br>/s/ Hilary B. Bonial<br>/s/ Tyler B. Jones       as Creditor's Authorized Agent | FOR COURT USE ONLY |
|---|---|---|

P.O. Box 829009<br>Dallas, TX 75382-9009

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

7778-N-4170

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
COVINGTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 09-20312-WSH |
| RHETT W FRAMBES | § | |
| RACHEL A. FRAMBES | § | CHAPTER 13 |
| DBA MUSIC BY REQUEST | § | |
| FDBA EVERYTHING BABY, LL | § | JUDGE WILLIAM S. HOWARD |

## EXHIBIT A

ITEMIZATION OF CLAIM AND SUMMARY OF SUPPORTING
DOCUMENTS FOR CLAIM OF JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, AS SERVICING
AGENT FOR BANK OF AMERICA NATIONAL ASSOCIATIONAS SUCCESSO BY MERGER TO LASALLE
BANK NA AS TRUSTEE FOR WAMU MORTGAGE PASS-THROUGH CERTIFICATES SERIES 2007-OA3
TRUST

### SECTION 1. ITEMIZATION OF CLAIM

| | | |
|---|---|---:|
| 1. | Total Debt (As of February 17, 2009) | $295,820.42 |
| 2. | Interest rate as of February 17, 2009 | 5.73% |
| 3. | Interest from Last Paid Installment | $6,968.67 |
| 4. | Detail of arrearage: (through February 17, 2009) | |
| | 5 payments 10/1/2008 through 2/17/2009 @ $1,141.70 each: | $5,708.50 |
| | Accrued late charges | $342.54 |
| | ** LEGAL COSTS | $1,642.24 |
| | ** OTHER CHARGES | |
| | TOTAL ARREARAGE | $7,693.28 |

The current monthly payment amount is $1,227.32. The monthly payment amount may change due to escrow
requirements and/or interest rate adjustments.

### RESERVATION OF RIGHTS

**Please be advised that reasonable fees and costs for the review of the bankruptcy pleadings, review of client
information, preparation and filing of the Proof of Claim will be charged to the lender/servicer for post-
petition services rendered subsequent to the filing of this bankruptcy matter. Further, note that future fees
and costs for bankruptcy related services are expected to accrue throughout the life of this bankruptcy case,
and will be charged to the lender/servicer. If allowed by the underlying security instrument, the bankruptcy
code and other applicable law and such fees and costs or charges are not paid through the bankruptcy, the
lender reserves the right, at the lender's discretion, to seek future reimbursement for the fees, costs and
charges related to services rendered and expenses incurred.**

Name of Creditor: JPMorgan Chase Bank, National Association, as servicing agent for Bank of America National
Associationas successo by merger to LaSalle Bank NA as trustee for WaMu Mortgage Pass-Through Certificates
Series 2007-OA3 Trust ("Bank of America")
File Number 7778-N-4170 / poc

EXHIBIT A - ITEMIZATION OF CLAIM AND SUMMARY OF SUPPORTING DOCUMENTS                                    1

| Vendor | Lerner, Sampson and Rothfuss, Co., LPA | Regarding: | | Invoice Number: | 12 |
|---|---|---|---|---|---|
| Address: | P. O. Box 1985 | FRAMBES RHETT W | | Invoice Status: | Sul |
| | Cincinnati, OH 45264-1985 | 353 | | Loan No.: | |
| Payee Code: | ATLERNER | COVINGTON, KY 41016 | | Loan Type: | Col |
| Vendor Contact: | Cynthia Puccini | | | Acquisition Date: | |
| Vendor Ref #: | 200904230 | | | Type: | Juc |
| Servicer: | WAMU (BUMC-PNC) | | | Referral Date : | 1/2 |
| Inv. ID / Cat. ID | 431/001 | | | Loan Location: | |
| Investor Name | WMMSC C/O B OF A AS TTEE | | | Submitted Date: | 2/ |
| Outsource Firm: | Fidelity National Foreclosure & Bankruptcy Solutions | | | Vendor Invoice Date: | 2/1 |

### Foreclosure - Interim/Pass Through

| Submitted | 1st Reviewed | Last Reviewed | Accepted | O/S Approved | Approved | Chk Requested | Chk Conf |
|---|---|---|---|---|---|---|---|
| 02/18/2009 | | | | | | | |

| Dept | Comments | Line Items | Exceptions | Edit Summary | Adj. Summary | Chronology | Quote | Service Request | Guideline | History |

| Fees | Total: | $550.00 | Prev. Billed: | $0.00 | Exc. Loan Allow: | | Exc Ord Allw: |
|---|---|---|---|---|---|---|---|
| Costs | Total: | $672.24 | Prev. Billed: | $0.00 | Exc. Loan Allow: | | Exc Ord Allw: |
| Totals | Inv Amt: | $1,222.24 | Prev. Billed: | $0.00 | | | Exc Ord Allw |

### Fees

| Category | Subcategory | Date | Qty | Price | Orig. Billed | Ac |
|---|---|---|---|---|---|---|
| Attorney Fees | Allowable | 02/11/09 | 1 | $550.00 | $550.00 | $ |
| Note: Initial Bill | | | | | | |
| | | | | Total: | $550.00 | |

### Costs

| Category | Subcategory | Date | Qty | Price | Orig. Billed | Ac |
|---|---|---|---|---|---|---|
| Filing Costs | Filing Fee Complaint | 02/11/09 | 1 | $153.00 | $153.00 | $ |
| Note: Filing Fee | | | | | | |
| Recording Costs | Lis Pendens/NOPA | 02/10/09 | 1 | $13.00 | $13.00 | $ |
| Note: Record Lis Pendens | | | | | | |
| Service Costs | Statutory Mailings | 02/16/09 | 1 | $139.24 | $139.24 | $ |
| Note: Issue CM - ServicingIssue CM - ServicingIssue CM - ServicingIssue CM - Servicing | | | | | | |
| Service Costs | Skip Trace/Search | 01/26/09 | 1 | $17.00 | $17.00 | $ |

https://im.fisdesktop.com/newinvoiceweb/NTNIInvoiceDetail.aspx

| | | | | | |
|---|---|---|---|---|---|
| | **Note:** Skip Trace/Investigative Rep. | | | | |
| Title Costs | Preliminary Title Report | 01/29/09 | 1 | $350.00 | $350.00 |
| | **Note:** Preliminary Title Service | | | | |

|  |  |
|---|---|
| **Total:** | **$672.24** |
| **Invoice Total:** | **$1,222.24** |

https://im.fisdesktop.com/newinvoiceweb/NTNIInvoiceDetail.aspx

| Vendor | Lerner, Sampson and Rothfuss, Co., LPA | | Regarding: | | Invoice Number: | 12 |
|---|---|---|---|---|---|---|
| Address: | P. O. Box 1985 | | FRAMBES RHETT W | | Invoice Status: | Sul |
| | Cincinnati, OH 45264-1985 | | 353 | | Loan No.: | ■ |
| Payee Code: | ATLERNER | | COVINGTON, KY 41016 | | Loan Type: | Cor |
| Vendor Contact: | Shelley Karow | | | | Acquistion Date: | |
| Vendor Ref #: | 200904230 | | | | Type: | Jud |
| Servicer: | WAMU (BUMC-PNC) | | | | Referral Date : | 1/2 |
| Inv. ID / Cat. ID | 431/001 | | | | Loan Location: | |
| Investor Name | WMMSC C/O B OF A AS TTEE | | | | Submitted Date: | 2/ |
| Outsource Firm: | Fidelity National Foreclosure & Bankruptcy Solutions | | | | Vendor Invoice Date: | 2/1 |

### Foreclosure - File Open - Placed on "Hold" by Lender

| Submitted | 1st Reviewed | Last Reviewed | Accepted | O/S Approved | Approved | Chk Requested | Chk Conf |
|---|---|---|---|---|---|---|---|
| 02/19/2009 | | | | | | | |

| Dept | Comments | Line Items | Exceptions | Edit Summary | Adj. Summary | Chronology | Quote | Service Request | Guideline | History |
|---|---|---|---|---|---|---|---|---|---|---|

| Fees | Total: | $420.00 | Prev. Billed: | $550.00 | Exc. Loan Allow: | | Exc Ord Allw: |
|---|---|---|---|---|---|---|---|
| Costs | Total: | $0.00 | Prev. Billed: | $672.24 | Exc. Loan Allow: | | Exc Ord Allw: |
| Totals | Inv Amt: | $420.00 | Prev. Billed: | $1,222.24 | | | Exc Ord Allw |

### Fees

| Category | Subcategory | Date | Qty | Price | Orig. Billed | Ac |
|---|---|---|---|---|---|---|
| Attorney Fees | Allowable | 02/18/09 | 1 | $220.00 | $220.00 | $ |
| | Note: Attorney Fees - Partial Foreclosure Kentucky | | | | | |
| Attorney Fees | Other | 02/10/09 | 1 | $200.00 | $200.00 | $ |
| | Note: Attorney Fees - Defective Mortgage/Deed | | | | | |

Total:    $420.00

Invoice Total:    $420.00

39US
M39

# ADJUSTABLE RATE NOTE
## (12-MTA Index - Payment and Rate Caps)`

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. MY MONTHLY PAYMENT INCREASES WILL HAVE LIMITS WHICH COULD RESULT IN THE PRINCIPAL AMOUNT I MUST REPAY BEING LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE THAN __110%__ OF THE ORIGINAL AMOUNT (OR $_____303,600.00__ ). MY INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THIS NOTE OR ANY RIDER TO THIS NOTE. A BALLOON PAYMENT MAY BE DUE AT MATURITY.

__JANUARY 17, 2007__        __FORT MITCHELL_____ , __KENTUCKY_____
                                                CITY                                    STATE

__353 RIVERBEND DRIVE, COVINGTON, KY  41015_____
                              PROPERTY ADDRESS

## 1. BORROWER'S PROMISE TO PAY
In return for a loan that I have received, I promise to pay U.S. $ _____276,000.00_____ plus any amounts added in accordance with Section 4 (G) below, (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is __WASHINGTON MUTUAL BANK, FA_____ . I will make all payments under this Note in form of cash, check or money order. I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder".

## 2. INTEREST
Interest will be charged on unpaid Principal until the full amount has been paid. Up until the first day of the calendar month that immediately precedes the first payment due date set forth in Section 3 of this Note, I will pay interest at a yearly rate of __7.808 %__. Thereafter until the first Change Date (as defined in Section 4 of this Note) I will pay interest at a yearly rate of __2.300__ %. The interest rate required by this Section 2 and Section 4 of this Note is the Rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS
### (A) Time and Place of Payments
I will pay Principal and interest by making payments every month. In this Note, "payments" refer to Principal and interest payments only, although other charges such as taxes, insurance and/or late charges may also be payable with the monthly payment.
I will make my monthly payments on __1ST__ day of each month beginning on __MARCH, 2007_____ . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied to interest before Principal. If, on __FEBRUARY 01, 2037_____ , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date".
I will make my monthly payments at __P.O. BOX 78148 PHOENIX, AZ 85062-8148_____
_____ , or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments
Each of my monthly payments until the first Payment Change Date will be in the amount of U.S. $ __1,062.05__ , unless adjusted at an earlier time under Section 4(H) of this Note.

32859 (11-01)                         Page 1 of 6                    LNT60USA (VERSION 1.0)

RWF

**(C) Payment Changes**
My monthly payment will be recomputed, according to Sections 4(E)(F)(G)(H) and (I) of this Note, to reflect changes in the Principal balance and interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

**4.  INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**
The interest rate I will pay may further change on the ____1ST____ day of ___MARCH, 2007_____, and on that day every month thereafter. Each such day is called a "Change Date".

**(B) The Index**
On each Change Date, my interest rate will be based on an Index. The "Index" is the Twelve-Month Average, determined as set forth below, of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve-Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.

The most recent Index figure available as of 15 days before each Interest rate Change Date is called the "Current Index". If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**
Before each Change Date, the Note Holder will calculate my new interest rate by adding __TWO AND 875/1000_____ percentage points __2.875__ % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-thousandth of one percentage point (0.001%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. In the event a new Index is selected, pursuant to paragraph 4(B), a new Margin will be determined. The new Margin will be the difference between the average of the old Index for the most recent three year period which ends on the last date the Index was available plus the Margin on the last date the old Index was available and the average of the new Index for the most recent three year period which ends on that date (or if not available for such three year period, for such time as it is available). This difference will be rounded to the next higher 1/8 of 1%.

**(D) Interest Rate Limit**
My interest rate will never be greater than __TEN AND 45/100_____ percentage points __10.450__ % ("Cap"), except that following any sale or transfer of the property which secures repayment of this Note after the first interest rate Change Date, the maximum interest rate will be the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of such sale or transfer.

**(E) Payment Change Dates**
Effective every year commencing __MARCH 01, 2008_____, and on the same date each year twelfth month thereafter ("Payment Change Date"), the Note Holder will determine the amount of the monthly payment that would be sufficient to repay the projected principal balance I am expected to owe as of the Payment Change Date in full on the Maturity Date at the interest rate in effect 45 days prior to the Payment Change Date in substantially equal payments. The result of this calculation is the new amount of my monthly payment, subject to Section 4(F) below, and I will make payments in the new amount until the next Payment Change Date unless my payments are changed earlier under Section 4(H) of this Note.

**(F) Monthly Payment Limitations**
Unless Section 4(H) and 4(I) below apply, the amount of my new monthly payment, beginning with a Payment Change Date, will be limited to 7 1/2% more or less than the amount I have been paying. This payment cap applies only to the principal payment and does not apply to any escrow payments Lender may require under the Security Instrument.

32859 (11-01)                          Page 2 of 6                          LNT60USB (VERSION 1.0)

RWF

**(G) Changes in My Unpaid Principal Due to Negative Amortization or Accelerated Amortization**

Since my payment amount changes less frequently than the interest rate and since the monthly payment is subject to the payment limitations described in Section 4(F), my monthly payment could be less or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the maturity date in substantially equal payments. For each month that the monthly payment is less than the interest portion, the Note Holder will subtract the monthly payment from the amount of the interest portion and will ad the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the current interest rate. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the excess towards a principal reduction of the Note.

**(H) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid principal can never exceed a maximum amount equal to ___110%___ of the principal amount original borrowed. In the event my unpaid Principal would otherwise exceed that ___110%___ limitation, I will begin paying a new monthly payment until the next Payment Change Date notwithstanding the 7 1/2% annual payment Increase limitation. The new monthly payment will be an amount which would be sufficient to repay my then unpaid Principal in full on the maturity date at my interest rate in effect the month prior to the payment due date in substantially equal payments.

**(I) Required Full Monthly Payment**

On the ___FIFTH___ anniversary of the due date of the first monthly payment, and on that same day every ___FIFTH___ year thereafter, the monthly payment will be adjusted without regard to the payment cap limitation in Section 4(F).

**(J) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(K) Failure to Make Adjustments**

If for any reason Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold Note Holder responsible for any damages to me which may result from Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies which I may have paid to partial Prepayment of unpaid Principal.

**5.  BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment". When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full prepayment or partial prepayments without paying any prepayment charge. The Note Holder will apply all of my prepayments to reduce the amount of principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the principal amount of the Note. If I make a partial prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial prepayment may have the effect of reducing the amount of my monthly payments, but only after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

RWF

39U2

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**Miscellaneous Fees:** I understand that the Note Holder will also charge a return item charge in the event a payment that I make in connection with repayment of this loan is not honored by the financial institution on which it is drawn. The current fee is $___15.00___. Lender reserves the right to change the fee from time to time without notice except as may be required by law.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of ___FIFTEEN___ calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be ___5.000___ % of my overdue payment of Principal and interest. I will pay this late charge promptly but only once of each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 10 days after the date on which the notice is delivered or mailed to me (or, if the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation buys all or part of Lender's rights under the Security Instrument, in which case the notice will specify a date, not less than 30 days from the date the notice is given the Borrower).

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note, whether or not a lawsuit is brought, to the extent not prohibited by Applicable Law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless Applicable Law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety, or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety, or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

32659 (11-01)                    Page 4 of 6                    LNT60USD (VERSION 1.0)

RWF

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) the request to assume is made after one year following recordation of the Deed of Trust, (b) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (c) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument or other obligations related to the Note or other loan document is acceptable to Lender, (d) Assuming party executes Assumption Agreement acceptable to Lender at its sole choice and discretion, which Agreement may include an increase to Cap as set forth below and (e) payment of Assumption Fee if requested by Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption and Lender may increase the maximum rate limit to the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of the transfer. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender has entered into a written Assumption Agreement with transferee and formally releases Borrower.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

## 12. MISCELLANEOUS PROVISIONS

In the event the Note Holder at any time discovers that this Note or the Security Instrument or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical or ministerial mistake, calculation error, computer error, printing error or similar error (collectively "Errors"), I agree, upon notice from the Note Holder, to reexecute any Loan Documents that are necessary to correct any such Errors and I also agree that I will not hold the Note Holder responsible for any damage to me which may result from any such Errors.

If any of the Loan Documents are lost, stolen, mutilated or destroyed and the Note Holder delivers to me an indemnification in my favor, signed by the Note Holder, then I will sign and deliver to the Note Holder a Loan Document identical in form and content which will have the effect of the original for all purposes.

RUF

WITNESS THE HAND (S) AND SEAL (S) OF THE UNDERSIGNED.

RHETT W FRAMBES

C125
83.8

RETURN TO: *PB-15758*
Advanced Land Title Agency
2116 Chamber Center Dr.
Ft. Mitchell, KY 41017

C3276 Pg 229

Return To: WASHINGTON MUTUAL BANK    FA
2210 ENTERPRISE DR
FLORENCE, SC 29501
DOC OPS M/S FSCE 440

Prepared By:
3050 HIGHLAND PARKWAY, 3RD FLR
DOWNERS GROVE, IL 60515

*Florena Arreglado.*

Preparer   FLORENCE ARREGLADO

———————————— [Space Above This Line For Recording Data] ————————————

ZKVT
M39

# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated   JANUARY 17, 2007 together with all Riders to this document.

(B) "Borrower" is   RHETT W FRAMBES AN UNMARRIED MAN

Borrower is the mortgagor under this Security Instrument.

KENTUCKY – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3018 1/01 (rev. 10/01)

-6(KY) (0110)

Page 1 of 15           Initials: _____
VMP MORTGAGE FORMS - (800)521-7291

RUF

C3276 Pg 230

(C) "Lender" is    WASHINGTON MUTUAL BANK, FA

Lender is a  FEDERAL SAVINGS BANK
organized and existing under the laws of THE UNITED STATES OF AMERICA
Lender's address is   2273 N, GREEN VALLEY PARKWAY, SUITE 14, HENDERSON, NV
89014
Lender is the mortgagee under this Security Instrument.
(D) "Note" means the promissory note signed by Borrower and dated    JANUARY 17, 2007
The Note states that Borrower owes Lender TWO HUNDRED SEVENTY SIX THOUSAND AND
00/100                                                                                  Dollars
(U.S. $    278,000.00    ) plus interest. Borrower has promised to pay this debt in regular
Periodic Payments and to pay the debt in full not later than  FEBRUARY 01, 2037
This Security Instrument secures 150% of the principal amount of the Note, but any amount
secured in excess of the amount stated in the second sentence of this paragraph must be a
"Protective Advance" as defined by Section 26 hereof (or, if the rate of interest is adjustable, may
be interest added to principal, commonly called "negative amortization").
(E) "Property" means the property that is described below under the heading "Transfer of Rights
in the Property."
(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late
charges due under the Note, and all sums due under this Security Instrument, plus interest.
(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The
following Riders are to be executed by Borrower [check box as applicable]:

| [X] Adjustable Rate Rider | [X] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(H) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable
final, non-appealable judicial opinions.
(I) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments
and other charges that are imposed on Borrower or the Property by a condominium association,
homeowners association or similar organization.
(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated
by check, draft, or similar paper instrument, which is initiated through an electronic terminal,
telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial
institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale
transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and
automated clearinghouse transfers.
(K) "Escrow Items" means those items that are described in Section 3.
(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or
proceeds paid by any third party (other than insurance proceeds paid under the coverages described
in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of
all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations
of, or omissions as to, the value and/or condition of the Property.
(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or
default on, the Loan.
(N) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest
under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(O) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.)
and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended
from time to time, or any additional or successor legislation or regulation that governs the same

Initials: RWF

-B(KY) (0110)                    Page 2 of 15                    Form 3018 1/01 (rev. 10/01)

Case 09-20312-tnw    Doc 51    Filed 09/20/10    Entered 09/20/10 16:54:27    Desc Main
Case 09-20312-tnw    Claim 8    Document    Page 14 of 40

C3276 Pg 231

subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(P) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender and Lender's successors and assigns, with power of sale, the following described property located in the COUNTY          [Type of Recording Jurisdiction]
of          KENTON          [Name of Recording Jurisdiction]:

THE LEGAL DESCRIPTION IS ATTACHED HERETO AS A SEPARATE EXHIBIT
AND IS MADE A PART HEREOF.

Tax Parcel ID Number:  840-20-01-020.22          which currently has the address of
353 RIVERBEND DRIVE          [Street]
COVINGTON          [City], Kentucky 41016          [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

Initials: RW

-6(KY) (0110)          Page 1 of 15          Form 3016 1/01 (rev. 10/01)

**C3276Pg 232**

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of

Initials: RJF

-6(KY) (0110)    Page 4 of 15    Form 3018 1/01 (rev. 10/01)

**C3276 Pg 233**

the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in

Initials: ___

-6(KY) (0110)    Page 3 of 15    Form 3018 1/01 (rev. 10/01)

Case 09-20312-tnw    Doc 51    Filed 09/20/10    Entered 09/20/10 16:54:27    Desc Main
Case 09-20312-tnw    Claim 8-D Document Page 23 of 46    Document    Page 17 of 40

C3276 Pg 234

a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and

-6(KY) (0110)                    Page 8 of 15                    Initials: RWF    Form 3018 1/01 (rev. 10/01)

restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or

C3276 Pg 236

with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for

Initials: RWF

—6(KY) (0110)                      Page 8 of 15                      Form 3018 1/01 (rev. 10/01)

C3276Pg 237

Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

Initials: _RWT_

-6(KY) (0110)    Page 9 of 15    Form 3018 1/01 (rev. 10/01)

C3276Pg 238

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from

Initials: RWE

**vC3276Pg 239**

Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred

Initials: RLH

C3276 Pg 240

in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking,

Initials RLJF

C3276 Pg 241

discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by
the presence, use or release of a Hazardous Substance which adversely affects the value of the
Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any
private party, that any removal or other remediation of any Hazardous Substance affecting the
Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance
with Environmental Law. Nothing herein shall create any obligation on Lender for an
Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration
following Borrower's breach of any covenant or agreement in this Security Instrument
(but not prior to acceleration under Section 18 unless Applicable Law provides otherwise).
The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a
date, not less than 30 days from the date the notice is given to Borrower, by which the
default must be cured; and (d) that failure to cure the default on or before the date
specified in the notice may result in acceleration of the sums secured by this Security
Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall
further inform Borrower of the right to reinstate after acceleration and the right to assert
in the foreclosure proceeding the non-existence of a default or any other defense of
Borrower to acceleration and foreclosure. If the default is not cured on or before the date
specified in the notice, Lender at its option may require immediate payment in full of all
sums secured by this Security Instrument without further demand and may foreclose this
Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses
incurred in pursuing the remedies provided in this Section 22, including, but not limited
to, reasonable attorneys' fees and costs of title evidence.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall
release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge
Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for
services rendered and the charging of the fee is permitted under Applicable Law.

24. Waiver of Homestead. Borrower waives all right of homestead exemption in the
Property.

25. Taxes and Assessments on Mortgage Insurance Premiums. If mortgage insurance
premiums are required to be paid by Borrower pursuant to Section 10, then in addition to such
premiums, Borrower shall pay all taxes and assessments thereon for so long as Borrower is required
by Lender to pay the premiums. All taxes and assessments on premiums due and payable by
Borrower shall be considered an Escrow Item and shall be paid by Borrower to Lender in the
manner provided for Escrow Items in Section 3.

26. Protective Advances. This Security Instrument secures not only the initial advance under
the Note, but also all Protective Advances. "Protective Advances" mean any advances to maintain
and protect the Property and/or protect Lender's rights in the Property made by Lender or by any
successors or assigns of Lender, including, without limitation, any sums, with interest, advanced
under Sections 5, 9, or 14 hereof: (a) to pay any Escrow Items; (b) to pay any sums secured by a lien
or encumbrance on the Property without which the priority of the secured position of Lender, including
the priority of this Security Instrument, or any successor or assign of Lender might be jeopardized;
(c) to secure, repair, maintain, protect or preserve the Property, or Lender's interest in the Property
and rights under this Security Instrument; or (d) to pay any and all expenses incident to the
collection of the indebtedness secured by this Security Instrument and the foreclosure thereof by
judicial proceedings, or otherwise, pursuant to Applicable Law, whether the Property is still owned
by the Borrower or is owned by a Successor in Interest of Borrower.

To the extent that any Protective Advances are deemed to be "future advances" or "additional
indebtedness" within the meaning of KRS 382.520, this Security Instrument secures such future
advances or additional indebtedness, provided that the total indebtedness at any one time
outstanding shall not exceed 150% of the original principal amount of the Note, with interest
thereon, and whether or not evidenced by notes, accounts or obligations of any kind whatsoever. It
shall be a default under this Security Instrument if Borrower requests a release, in the manner
provided by KRS 382.520, of any portion of the lien securing any of the additional indebtedness
secured by this Security Instrument pursuant to KRS 382.520 prior to the date that all of the
obligations secured by this Security Instrument have been paid and discharged and the Note and this

Initials: RWF

C3276 Pg 242

ZKY2
Security Instrument have been terminated, and Borrower hereby waives any and all right to
request such a release to the maximum extent permitted by Applicable Law.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained
in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _____ (Seal)
                                                                  -Borrower
                                          RHETT W FRAMBES

_____          _____ (Seal)
                                                                  -Borrower

_____ (Seal)              _____ (Seal)
                   -Borrower                                     -Borrower

_____ (Seal)              _____ (Seal)
                   -Borrower                                     -Borrower

_____ (Seal)              _____ (Seal)
                   -Borrower                                     -Borrower

-6(KY) (0110)              Page 14 of 15          Form 3018 1/01 (rev. 10/01)

C3276 Pg 243

STATE OF KENTUCKY,    ~~XXXXXX~~   BOONE    County ss:

The foregoing instrument was acknowledged before me this 1/19/2007

by    RHETT W FRAMBES

My Commission Expires:

_Linda S. Stickley_

Notary Public

**LINDA S. STICKLEY**
Notary, Kentucky State at Large
My Commission Expires Dec. 1, 2007

Initials: _RWF_

Form 3018 1/01 (rev. 10/01)

-6(KY) (0110)                    Page 15 of 15

C3276Pg 244

## ADJUSTABLE RATE RIDER
### (12-MTA Index - Payment and Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this ___17TH___ day of JANUARY, 2007 _____, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to ___WASHINGTON MUTUAL BANK, FA_____ (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

353 RIVERBEND DRIVE, COVINGTON, KY 41016_____
(PROPERTY ADDRESS)

THIS RIDER CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. MY MONTHLY PAYMENT INCREASES WILL HAVE LIMITS WHICH COULD RESULT IN THE PRINCIPAL AMOUNT I MUST REPAY BEING LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE THAN __110%___ OF THE ORIGINAL AMOUNT (OR $___303,600.00_____). MY INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THE NOTE AND RIDER. A BALLOON PAYMENT MAY BE DUE AT MATURITY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
Interest will be charged on unpaid Principal until the full amount of Principal has been paid. Up until the first day of the calendar month that immediately precedes the first payment due date set forth in Section 3 of the Note. I will pay interest at a yearly rate of ___7.808__%. Thereafter until the first Change Date (as defined in Section 4 of the Note) I will pay interest at a yearly rate of __2.300___%. The interest rate I will pay will thereafter change in accordance with Section 4 of the Note.

RWF

**C3276 Pg 245**

Section 4 of the Note provides for changes in the interest rate and monthly payment as follows:

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**
The interest rate I will pay may change on the ___1ST___ day of ___MARCH, 2007___, and on that day every month thereafter. Each such day is called a "Change Date".

**(B) The Index**
On each Change Date, my interest rate will be based on an Index. The "Index" is the Twelve-Month Average, determined as set forth below, of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve-Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.

The most recent Index figure available as of the date 15 days before each Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Interest Rate Change**
Before each Change Date, the Note Holder will calculate my new interest rate by adding ___TWO AND 875/1000___ percentage points ___2.875___% ("Margin") to Current Index. The Note Holder will then round the result of this addition to the nearest one thousandth of one percentage point (0.001%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. In the event a new Index is selected, pursuant to paragraph 4(B), a new Margin will be determined. The new Margin will be the difference between the average of the old Index for the most recent three year period which ends on the last date the Index was available plus the Margin on the last date the old Index was available and the average of the new Index for the most recent three year period which ends on that date (or if not available for such three year period, for such time as it is available). The difference will be rounded to the next higher 1/8 of 1%.

**(D) Interest Rate Limit**
My interest rate will never be greater than ___10.450___% ("Cap"), except that following any sale or transfer of the property which secures repayment of this Note after the first interest rate Change Date, the maximum interest rate will be the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of such sale or transfer.

**(E) Payment Change Dates**
Effective every year commencing ___MARCH 01, 2008___, and on the same date each twelfth month thereafter ("Payment Change Date"), the Note Holder will determine the

32843 (11-01)                Page 2 of 6                LRD02USB (VERSION 1 0)

RWF

C3276Pg 246

amount of the monthly payment that would be sufficient to repay the projected Principal balance I am expected to owe as of the Payment Change Date in full on the maturity date at the interest rate in effect 45 days prior to the Payment Change Date in substantially equal payments. The result of this calculation is the new amount of my monthly payment, subject to Section 4(F) below, and I will make payments in the new amount until the next Payment Change Date unless my payments are changed earlier under Section 4(H) of the Note.

**(F) Monthly Payment Limitations**

Unless Section 4(H) and 4(I) below apply, the amount of my new monthly payment, beginning with a Payment Change Date, will be limited to 7 1/2% more or less than the amount I have been paying. This payment cap applies only to the Principal Payment and does not apply to any escrow payments Lender may require under the Security Instrument.

**(G) Changes in My Unpaid Principal Due to Negative Amortization or Accelerated Amortization**

Since my payment amount changes less frequently than the interest rate and since the monthly payment is subject to the payment limitations described in Section 4(F), my monthly payment could be less or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the maturity date in substantially equal payments. For each month that the monthly payment is less than the interest portion, the Note Holder will subtract the monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the current interest rate. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the excess towards a Principal reduction of the Note.

**(H) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid Principal can never exceed a maximum amount equal to __110%__ of the principal amount original borrowed. In the event my unpaid Principal would otherwise exceed that __110%__ limitation, I will begin paying a new monthly payment until the next Payment Change Date notwithstanding the 7 1/2% annual payment increase limitation. The new monthly payment will be an amount which would be sufficient to repay my then unpaid principal in full on the maturity date at my interest rate in effect the month prior to the payment due date in substantially equal payments.

**(I) Required Full Monthly Payment**

On the __FIFTH__ anniversary of the due date of the first monthly payment, and on that same day every __FIFTH__ year thereafter, the monthly payment will be adjusted without regard to the payment cap limitation in Section 4(F).

**(J) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any questions I may have regarding the notice.

RWi

RMT 2

**C3276 Pg 247**

### (K) Failure to Make Adjustments

If for any reason Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold Note Holder responsible for any damages to me which may result from Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies which I may have paid to partial prepayment of unpaid "Principal."

## B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Section 18 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser. If all or any part of the Property or any interest in the Property is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Agreement or other obligations related to the Note or other loan document is acceptable to Lender, (c) Assuming party executes Assumption Agreement acceptable to Lender at its sole choice and discretion, which Agreement may include an increase to Cap as set forth below and (d) payment of Assumption Fee if requested by Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption, and Lender may increase the maximum interest rate limit to the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of the transfer. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender has entered into a written assumption agreement with transferee and formally releases Borrower.

RW



C3276 Pg 248

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

RWF

C3276 Pg **249**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider. Borrower agrees to execute any document necessary to reform this Agreement to accurately reflect the terms of the Agreement between Borrower and Beneficiary or if the original Note, Trust Deed or other document is lost, mutilated or destroyed.

_RHETT W FRAMBES_

RHETT W FRAMBES



C3276 Pg 250

# CONDOMINIUM RIDER

8RUS
M39

THIS CONDOMINIUM RIDER is made this 17TH day of JANUARY 2007 and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to

WASHINGTON MUTUAL BANK, FA

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

353 RIVERBEND DRIVE, COVINGTON, KY 41016

[Property Address]

The Property includes a unit in, together with an undivided interest in the common elements of, a condominium project known as:

UNKNOWN

[Name of Condominium Project]

(the "Condominium Project"). If the owners association or other entity which acts for the Condominium Project (the "Owners Association") holds title to property for the benefit or use of its members or shareholders, the Property also includes Borrower's interest in the Owners Association and the uses, proceeds and benefits of Borrower's interest.

CONDOMINIUM COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A. Condominium Obligations. Borrower shall perform all of Borrower's obligations under the Condominium Project's Constituent Documents. The "Constituent Documents" are the: (i) Declaration or any other document which creates the Condominium Project; (ii) by-laws; (iii) code of regulations; and (iv) other equivalent documents. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

MULTISTATE CONDOMINIUM RIDER - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

-8R (0008)      Form 3140 1/01
Page 1 of 3      Initials: _____
VMP MORTGAGE FORMS - (800)521-7291

RWF



**B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy on the Condominium Project which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, from which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, whether to the unit or to common elements, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender for application to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property, whether of the unit or of the common elements, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the Condominium Project, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the Constituent Documents if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

Initials: RWÉ

-8R (0008)   Page 2 of 3   Form 3140 1/01

C3276 Pg 252

F. **Remedies.** If Borrower does not pay condominium dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Condominium Rider.

_____ (Seal)                    _____ (Seal)
             -Borrower                                          -Borrower

                                                RHETT W FRAMBES

_____ (Seal)                    _____ (Seal)
             -Borrower                                          -Borrower

_____ (Seal)                    _____ (Seal)
             -Borrower                                          -Borrower

_____ (Seal)                    _____ (Seal)
             -Borrower                                          -Borrower


-8R (0008)                        Page 3 of 3                    Form 3140 1/01

C3276Pg **253**

File No.: pb-15758

# EXHIBIT A

the following described Real Estate in the City of Ludlow, County of Kenton and Commonwealth of Kentucky, to-wit:

Being Unit 20-202, a condominium unit, River's Breeze Condominium, Lot 20, a condominium project, the Declaration of Master Deed for River's Breeze Condominium which is of record at Official Record Book C-1234, Page 298 of the Kenton County Clerk's records at Covington, Kentucky.

Together with the exclusive right to use Garage #20-G4, as shown on the plat referred to above, which right shall pass with and be appurtenant to the unit described above.

This conveyance includes the undivided interest in the Common Areas (elements), both general and limited, appurtenant to each Unit described in this conveyance. This deed also operated as notice that the Grantee(s) is a member of the River's Breeze Council of Co-Owners, Inc., a Kentucky corporation. Each share in the corporation is identical and has only one vote. One share is appurtenant to each unit in the condominium project. One and only one share is appurtenant to each unit.

This conveyance is made subject to and/or benefited by all easements, conditions and restrictions of record; zoning ordinances or regulations; and taxes and assessments both general and special, not yet due and payable.

This conveyance is further subject to all of the provisions of a Declaration of Master Deed for River's Breeze Condominium, referred to above, as from time to time amended and/or supplemented, including but not limited to, the Twenty-Sixth Amendment to Declaration of Master Deed (Phase 27) for River's Breeze Condominium recorded in Official Record Volume C-2812, Page 305 and subject to a Declaration of Ingress and Egress Easement which is of record at Official Record Book C-1234, Page 282 of the Kenton County Clerk's records at Covington, Kentucky.

Further subject to the Declaration of Restrictions recorded in Official Record Volume C-1941, Page 27 of the Kenton County Clerk's records at Covington, Kentucky, and all amendments and supplements thereto.

Deed Book C2856 Page 226

PIDN No. 840-20-01-020.22

Group No. 5273

rjd

RWF

**Return Address:**

Washington Mutual Bank
Office of the Corporate Secretary
1301 2nd Ave., WMC3501
Seattle, WA  98101



**200810030000790**
COOK
PAGE-001 OF 003
10/03/2008 13:11
KING COUNTY, WA
RFF    44.00

Please print or type information WASHINGTON STATE RECORDER'S Cover Sheet (RCW 65.04)

**Document Title(s)** (or transactions contained therein): (all areas applicable to your document **must** be filled in)
1. Affidavit of the Federal Deposit
   Insurance Corporation                2. _____

3. _____             4. _____

**Reference Number(s) of Documents assigned or released:**

Additional reference #'s on page _____ of document

**Grantor(s)** Exactly as name(s) appear on document
1. Washington Mutual Bank, formerly known
   as Washington Mutual Bank, FA _____, _____
   Federal Deposit Insurance
2. Corporation _____, _____

Additional names on page _____ of document.

**Grantee(s)** Exactly as name(s) appear on document

1. JPMorgan Chase Bank, National Association _____

2. _____, _____

Additional names on page _____ of document.

**Legal description** (abbreviated: i.e. lot, block, plat or section, township, range)

_____
_____
_____

Additional legal is on page _____ of document.

**Assessor's Property Tax Parcel/Account Number**              ☐ Assessor Tax # not yet
assigned

The Auditor/Recorder will rely on the information provided on this form. The staff will not read the document
to verify the accuracy or completeness of the indexing information provided herein.

"I am signing below and paying an additional $50 recording fee (as provided in RCW 36.18.010 and
referred to as an emergency nonstandard document), because this document does not meet margin and
formatting requirements. Furthermore, I hereby understand that the recording process may cover up or
otherwise obscure some part of the text of the original document as a result of this request."

                                        Signature of Requesting Party
_____   _____   _____

Note to submitter: Do not sign above nor pay additional $50 fee if the document meets margin/formatting requirements

Recording Requested By and
When Recorded Mail to:
```
Washington Mutual Bank
Office of the Corporate Secretary
1301 2nd Ave., WMC3501
Seattle, WA  98101
```

---

**Space Above for Recording Information**

### AFFIDAVIT OF THE
### FEDERAL DEPOSIT INSURANCE CORPORATION

I, Robert C. Schoppe, having been first duly sworn, hereby make this Affidavit and say
that:

1.      I am an authorized representative of the Federal Deposit Insurance Corporation,
an agency of the United States government (the "FDIC").

2.      On September 25, 2008, Washington Mutual Bank, formerly known as
Washington Mutual Bank, FA ("Washington Mutual"), was closed by the Office of Thrift
Supervision and the FDIC was named receiver.

3.      As authorized by Section 11(d)(2)(G)(i)(II) of the Federal Deposit Insurance Act,
12 U.S.C § 1821(d)(2)(G)(i)(II), the FDIC, as receiver of Washington Mutual, may
transfer any asset or liability of Washington Mutual without any approval, assignment, or
consent with respect to such transfer.

4.      Pursuant to the terms and conditions of a Purchase and Assumption Agreement
between the FDIC as receiver of Washington Mutual and JPMorgan Chase Bank,
National Association ("JPMorgan Chase"), dated September 25, 2008 (the "Purchase and
Assumption Agreement"), JPMorgan Chase acquired certain of the assets, including all
loans and all loan commitments, of Washington Mutual.

5.      As a result, on September 25, 2008, JPMorgan Chase became the owner of the
loans and loan commitments of Washington Mutual by operation of law.

Executed this 2ND day of October, 2008 in Seattle, King County, Washington.

By: _____
Print Name: Robert C. Schoppe
Title: Receiver In Charge for FDIC as
Receiver of Washington Mutual Bank

DOCSSEA/186745.v1

-1-

## NOTARY'S ACKNOWLEDGMENT

| | | |
|---|---|---|
| STATE OF WASHINGTON | ) | |
| | ) SS. | |
| COUNTY OF KING | ) | |

I certify that I know or have satisfactory evidence that Robert C. Schoppe is the person who appeared before me, and said person acknowledged that he signed this instrument, on oath stated that he was authorized to execute the instrument and acknowledged it as the Receiver In Charge of the Federal Deposit Insurance Corporation, as Receiver of Washington Mutual Bank to be the free and voluntary act of such party for the uses and purposes mentioned therein.

Dated this 2nd day of October, 2008.

Notary Public in and for the State of
Washington, residing in Redmond
My commission expires: 11/7/10

DOCSSEA/186745.v1

-2-

STATE OF WASHINGTON }
County of King

The Director of Records & Licensing, King County, State of
Washington and exofficio Recorder of Deeds and other
instruments, do hereby certify the foregoing copy has been
compared with the original instrument as the same appears
on file and of record in the office and that the same is a true
and perfect transcript of said original and of the whole thereof.
Witness my hand and official seal this _____ day
of_____ 20____

OCT 0 3 2006

Director of Records & Licensing

S. Harper
(Deputy)

R. Harper